

# THE ATTORNEY GENERAL
# OF TEXAS

AUSTIN 11, TEXAS

**WILL WILSON**
ATTORNEY GENERAL

March 5, 1957

Hon. C. H. Cavness
State Auditor
Capitol Station
Austin, Texas

Opinion No. WW 43

Re: Legality of legislative ap-
propriations for benefit of
the Alabama Coushatta Indian
Reservation in Polk County,
and related questions.

Dear Sir:

     Your letter of February 7, 1957 presents certain
questions regarding the Alabama Coushatta Indian Reserva-
tion in Polk County. Broadly stated, you inquire as to
the legality of state appropriations for the benefit of
said Reservation, as to the effect of certain phases of
Public Law 627, 83rd Congress, terminating Federal super-
vision over said tribe, as to the right of the state to
erect certain improvements on the 1280 acre portion of
the Reservation bought by the state for the Indians in
1854, and as to the proper disposal of funds from timber
sales on said tract.

     Before attempting to answer your several ques-
tions specifically, we deem it appropriate to review the
history of Indian legislation in Texas.

     Within less than a year after the battle of
San Jacinto, the Republic of Texas enacted its first
Indian aid bill. The Act of December 5, 1836, 1
Gammel's Laws of Texas 1113, required President Sam
Houston to raise a calvary force of 280 men and to
erect necessary block houses, forts and trading houses
to prevent Indian depredations. He was further directed
to "enter into such negotiations and treaties as in his
opinion may secure peace to the frontiers; and that he
have power to appoint agents to reside amongst the
Indians and that he be authorized to distribute amongst
the different tribes such presents as he may deem neces-
sary, not exceed in amount $20,000."

Interestingly enough, 5 days later, an Act was passed authorizing the president to borrow $20,000 for "purchasing ammunition and munitions of war." 1 Gammel 1136.

The Joint Resolution of November 7, 1838, 2 Gammel 3, appropriated another $20,000 to the equipping of an army of 250 men under General Thomas J. Rusk "to quell the insurrection now existing among the Indians and Mexicans." This Act was followed by others at frequent intervals in an effort to hold off the depredations of hostile tribes.

In the meantime it appears that a department of Indians Affairs was set up, which, appropriately enough, ran in the red; and a Joint Resolution of January 15, 1839 appropriated $2,000 to pay off "arrearages" in said department for the year 1838. 2 Gammel 45.

At an early date, the plan was inaugurated of placing the Indians in segregated areas or "reservations", away from white settlements, in an effort to keep the peace. The Act of January 14, 1840, 2 Gammel 371, required President Mirabeau Lamar to have surveyed two leagues of land, including the "Coshattee" Indian Village, and 2 leagues of land, including the fenced in village of the Alabama tribe, for the "exclusive use and benefit of said tribes of Indians, until otherwise provided for by law". The president was also ordered to have surveyed a 30 mile square on the frontier, on which friendly Indians were to be placed as soon as circumstances would permit. An "Indian Agent for the Coshattee and Alabama tribes" was to be appointed and "$2,000 in promissory notes" was appropriated therefor.

On February 5, 1840 an Act was passed appropriating not exceeding $1,000 for "supporting the Caddo Indians, while their arms were detained from them". 2 Gammel 417. The general appropriation bill of January 6, 1843 contained this item: "For Indian purposes -- $10,000." 2 Gammel 828.

The Act of January 14, 1843 created a "Bureau of Indian Affairs" attached to the War Department and

provided for appointment of four Indian Agents and one Superintendent. The President of the Republic was given "power to make such arrangements and regulations with the several tribes of Indians as he may deem expedient for the establishment and preservation of peace, and the promotion of the common welfare." Commissioners were given certain instructions in making treaties with the tribes and certain restrictions were imposed on trade with the Indians. 2 Gammel 842.

On February 3, 1854, an Act was passed authorizing the grant out of the public domain or the purchase by the State for the Alabama Indians of the land involved in your request, being 1280 acres in Polk and/or Tyler Counties "as a home for the said tribe of Indians." 4 Gammel 68. A price not to exceed $2 an acre was authorized and warranty deeds were to be taken "conveying the same to said tribe of Indians." The Act forbade alienating or leasing the land and provided for a reversion of the land to the State in the event another home was provided by the State.

Patterned after the Act just mentioned and closely following its terms was the Act of August 30, 1856 granting a 640 acre reservation to the "Coshattee" tribe in Liberty, Polk or Tyler Counties. 4 Gammel 503. Later the Act of February 16, 1858 appropriated $5,000 for the removal of said tribe to such a place as the governor and the chiefs could agree on, with the former reservation reverting to the State. 4 Gammel 1154.

Other reservations were being provided for in the 1850's. The Act of February 6, 1854 authorized the Federal government to select up to 12 leagues of Texas land, divided into not over 3 squares, for the establishment of Federal reservations for the Indian tribes of Texas. 3 Gammel 1495. The Act of February 4, 1856 authorized the Federal Government to set apart 5 leagues west of the Pecos for reservations in that area. 4 Gammel 258. The Federal Government appears to have been dilatory about setting up reservations west of the Pecos, and the Act of January 29, 1858 urged prompt federal action inasmuch as the roving Indians in the area were committing depredations against the white

settlers. 4 Gammel 1148. The Act of January 25, 1875 declared that the 17 leagues above mentioned had been abandoned as reservations and had reverted to the State, and they were opened for settlement as a part of the public domain. 8 Gammel 376.

By Act of December 30, 1861, the office of "Indian Agent of the Alabama and Cooshattie (sic) Indians" was created with a salary of $400 per annum and $800 expenses. The agent was required to promote the interests of the tribe. 5 Gammel 541.

The General Appropriation Bill for the years 1864-65 contained an item: "for the Alabama, Coshattee and Muscogee Indians, per annum, $1,000". 5 Gammel 696. The Act of December 4, 1863 required the Indian agent for these tribes to make annual reports, on penalty of removal from office. 5 Gammel 719.

During the Civil War, two bills were passed for the relief of the Tonkaway tribe on the frontier. $20,000 was appropriated for their actual support on December 16, 1863, apparently as a military measure. 5 Gammel 738. On May 28, 1864, an Act recited the loyalty of this tribe and the fact of the destruction of half of them by the enemy, the remainder being wanderers, and authorized the governor to settle them on the public domain. $35,000 a year for two years was appropriated for their support. 5 Gammel 800.

During the last year of the Texas Republic, a "Treaty of Peace, Friendship and Commerce", dated October 9, 1844, was entered into between the Republic and the Comanche, Keechie, Waco, Caddo, Ana-dah-kah, Ionie, Delaware, Shawnee, Cherokee, Lipan and Tah-wah-karre tribes. 2 Gammel 1191. The treaty hopefully recited "The tomahawk shall be buried, and no more blood appear in the path between them, now made white. The Great Spirit will look with delight upon their friendship, and will frown in anger upon their enmity."

Despite the bright hopes for lasting peace voiced in the treaty, the early laws of Texas reflect that Indian depredations were a fairly constant problem up until about 1880. The Act of February 12, 1840

authorized raising a volunteer force of 300 men to march up
the Brazos River against Indian raiders. 2 Gammel 638.
After Texas became a state, the legislature sent many
pleas to Washington for protection and indemnity. See
3 Gammel 523, 6 Gammel 79, 415, 1051 and 8 Gammel 1489.
The Joint Resolution of April 12, 1871 gave a reward
of one carbine to each of certain persons for killing 4
Indians in repelling a raid. 6 Gammel 1058. The Act
of March 13, 1875 gave certain relief to pre-emptors
driven off their homesteads by hostile Indians. 8
Gammel 479.

One system used to keep down Indian depreda-
tions was to locate the Indians on the "frontier". White
settlements were kept well back from the frontier; and,
to keep the Indians from coming into the settlements to
trade, trading posts were set up on the Indian reserves.
Indian agents were instructed, so far as possible, to
prevent Indians from coming into settlements. 2 Gammel
1138. They were also to endeavor "to prevent any
irruption (sic) on the frontier settlements". Congress
was petitioned in the Act of March 20, 1848 to estab-
lish a chain of military posts as a buffer between the
white frontier settlements and the Indians. 3 Gammel 206.
Eventually, this was done. 1956-57 Texas Almanac p. 67.

The Joint Resolution of September 5, 1850
complained to Washington that "wild" Indians had immi-
grated into Texas from other states, killing and plunder-
ing the frontier settlements. Demand was made for their
removal and that such immigration be stopped. 3 Gammel
812.

Particular thorns in the sides of the settlers
were the Comanche and Kiowa Indians from the Ft. Sill
reservation in the Indian Territory, now Oklahoma, who
made frequent raids on the Texas frontier settlements.
In 1871 a joint resolution requested Congress to move
them at least 150 miles from the frontier. 6 Gammel 1054.
A similar resolution passed in 1873. 7 Gammel 681. See
also Joint Resolution of 1879 protesting raids emanating
from Ft. Sill and Ft. Stanton against the Panhandle area.
8 Gammel 1489. The Joint Resolution of April 4, 1871
urged Congress to open up the Indian Country north of
Texas to settlement and to organize same into a state.

This was doubtless an important step leading to the eventual creation of the State of Oklahoma. 6 Gammel 1056.

Throughout this trying period, Indian raids resulted in the capture of many prisoners from the white settlements. The early Texas laws are replete with efforts to recover these captives, chiefly by authorizing payment of ransom. 2 Gammel 712, 714, 767, 825; 3 Gammel 1491; 5 Gammel 960; 6 Gammel 923, 940.

Texas Indian legislation for some reason appears to have come to an abrupt halt about 1880. Almost nothing is found in the legislative proceedings specifically dealing with Indians from that date until 1927 when the Texas Senate adopted a resolution that a committee be appointed to investigate the welfare of the Alabama Indians and report back at the next session. Senate Journal, 40th Leg., 1st C.S. 1927, p. 252. The Committee report, dated January 16, 1929, is printed in the Senate Journal, 41st Leg., R.S. 1929, p. 760.

The Committee reported that they found the Alabama tribe "and the Coushatta Indians who live with them" in a state of great neglect and poverty. Their poor economic state, said the committee, "is a result of the treatment they have received at the hand of the white man who came and took from them their lands and destroyed the game that was once plentiful in the areas between the Sabine and Trinity Rivers; the territory which the Alabama and Coushatta Indians claimed . . . ."

The report said "Investigations revealed that this tribe has rendered outstanding services to the Republic of Texas and to the State. Chief Colita and Chief Tempe were staunch friends of General Sam Houston during the Texas Revolution and rendered invaluable assistance to the Savior of Texas". It was recited that though they were citizens neither of Texas nor of the Confederacy, the Alabamas had 21 men in the Confederate Army; and again in 1918 they volunteered in large numbers, being rejected because of "the peculiar relationsip they bore to the Federal Government." (Indians became American citizens by the Act of Congress of June 2, 1924, 43 Stat. 253).

"The Alabama and Coushatta Indians of Polk
County," the report continued, "are wards of the Nation;
They are also wards of the State. No group of citizens
can point with more pride to past services rendered to
the Republic and to the State than can these Red Skins
of Texas' Big Thicket. It was the Coushatta Indians who
assisted Sam Houston in the Revolution. Chief Colita
of the Coushatta Tribe slaughtered his own cattle to
feed the starving women and children who were fleeing
before the battle of San Jacinto. It was Colita who
carried the news of the victory to the border of Louisi-
ana and brought the tired Texans back to their homes.
The history of this tribe is rich in service rendered
to the immortal Houston . . . The responsibility of caring
for these citizens rests upon the State and upon the
nation." (Emphasis added).

The Legislature responded to the report by
placing an item in the departmental appropriation bill
under the heading of "Eleemosynary Institutions" to
cover the salary of an agent and a nurse, dental and
medical work, "50 homes for inmates" costing $15,000,
and 26 miles of fencing. Acts 41st Leg., 1929, 3rd
C.S., Ch. 16 at p. 484. The reservation is located
in an area 17 miles east of Livingston and 20 miles
west of Woodville in an area richly endowed with virgin
timber, readily available for the building of said homes.
Regular appropriations have been made for the tribe since
1929 and are currently carried as an item in the appro-
priation for the Board for Texas State Hospitals and
Special Schools. See Acts 54th Leg., R.S., 1955, Ch. 519,
at p. 1374. The appropriation for the 1st year of the
biennium is $65,607.00 and for the second $67,107.00.
Its wording is patterned after that for other institu-
tions under said Board.

Early Texas laws in many respects paralleled
United States Government Acts dealing with Indians. The
Act of Congress of July 9 1832 provided for a Commissioner
of Indian Affairs under the War Department. 4 Stat. 564.
The Bureau headed by the commissioner is now under the
Secretary of the Interior. 25 USCA, Secs. 1 & 2. Federal
reservations for the Indians were created in many parts
of the United States. Some were created by Act of Con-

gress, some by Executive order and some by treaties with the tribes. 25 USCA, Sec. 331.  In 1871, Congress dis-continued recognition of the tribes as independent nations and decreed that no further "treaties" were to be made with them.  25 USCA. Sec. 71.

These reservations were located on vacant Feder-al lands.  Provision was made for allotment of up to 80 acres of arable or 160 acres of grazing land in the reser-vation to each Indian.  A preliminary patent was granted holding the land in trust for the particular Indian for 25 years, at the end of which time andther patent was issued to him conveying full fee simple title, giving him the right to sell or dispose of the land in any way he saw fit.  25 USCA, Sec. 348.  At the end of such 25 year trust period, the allottee of the land war to be governed by the civil and criminal laws of the State the same as any other person.  25 USCA, Sec. 349.  Over the years the Federal Government has erected schools and hospitals, given agricultural assistance and vocational training and in many other ways has endeavored to con-tribute to the welfare of the various tribes.  See, for example, 25 USCA, Secs. 452 and 471.

Very recently, congressional legislation ap-pears to have headed in an entirely new direction.  It was heralded by the passage on August 1, 1953 of House Concurrent Resolution 108, 67 Stat. B 132, which stated:

"Whereas it is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and re-sponsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship . . .", it was declared "to be the sense of Congress that, at the earliest possible time, all of the Indian tribes and the individual members thereof located within the states of Texas. . . should be freed from Federal supervision and control and from all disabilities and limitations specifi-cally applicable to Indians . . . It is further declared

to be the sense of congress that, upon the release of such tribes and individual members thereof from such disabilities and limitations, all offices  of the Bureau of Indian Affairs in the States of . . . Texas. . . and all other offices of the Bureau of Indian Affairs whose primary purpose was to serve any Indian tribe or individual Indian freed from Federal supervision should be abolished."  The Resolution instructed the Secretary of the Interior to investigate and recommend legislation to accomplish these purposes.

This resolution appears to be in line with the philosophy of Honorable Glenn R. Emmons, present Commissioner of Indian Affairs, whose appointment by the President was made during the month immediately prior to the passage of the resolution.  See "He's giving the Indians a Chance", by James Daniel.  Readers Digest, March, 1957.

The new policy was soon put into effect and a number of acts have been passed terminating Federal supervision over various tribes.  25 USCA, Secs. 564 et seq. The Act of August 23, 1954 terminated such supervision over "the Alabama and Coushatta Tribes of Texas".  Public Law 627, 68 Stat. 768, 25 USCA Secs. 721 et seq.  In 1928 the Federal Government had purchased and taken a deed "in trust for the Alabama and Coushatta Indians of Texas" to 3071 acres in Polk County, adjacent to the 1280 acres purchased by the State in 1854, enlarging the reservation to 4351 acres.  Said Public Law 627 authorized the Secretary of the Interior to convey the 3071 acres to the State of Texas "in trust for the benefit of the Indians of the Alabama and Coushatta Tribes of Texas, subject to such conditions regarding management and use as the State of Texas may prescribe and the disposition of such lands shall be subject to approval of a majority of the adult members of the Alabama and Coushatta Tribes of Texas." The original recorded deed from the Secretary of the Interior is on file in the office of the Texas Secretary of State.  The Act further provided that Federal Indian statutes should no longer be applicable to this tribe and that "the laws of the several states shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction."

For a summary of Public Law 627 and its background see
the House Committee Report in U. S. Code Congressional
and Administrative News, 1954, pp. 3119 et seq.

In anticipation of the adoption of Public Law
627, the Legislature adopted Senate Concurrent Resolution
No. 31 (Acts 1953, R.S. p. 1078) authorizing the Governor
to accept on behalf of the State the transfer of the
trust, conditioned on consent of the tribe by appropriate
resolution, and further authorizing the Governor to desig-
nate the State agency in which such trust responsibilities
shall rest, which agency was granted rule making powers
in connection with such trust.

The Joint Resolution of Congress of July 14,
1956, 70 Stat. 531, 25 USCA, Sec. 304a, provides for a
2 year study by the Bureau of Indian Affairs of the
"program for transferring Indian children to public
schools." The Act of August 3, 1956, 70 Stat. 986, pro-
vides for vocational training for Indians between 18 and
35 in recognized schools and 3½ million dollars a year
is authorized to be appropriated therefor. Public Law 991,
approved August 6, 1956, 70 Stat. 1057, 25 USCA, Sec.
443a, authorizes the Secretary of the Interior to convey
to Indian tribes, bands or groups Federal buildings and
improvements located on their lands.

We have reviewed at some length Federal and
State legislation dealing with Indians because we feel
that your inquiries, and particularly question No. 1,
must be answered in the light of historical perspective.

In your first question, you ask our opinion as
to the legality of past and present legislative appropria-
tions for the aforesaid tribe. We are of the opinion that
such appropriations were and are valid and constitutional.
The regulation and assistance of Indian reservations has
been regarded as a proper governmental function since the
days of the Republic. Indeed in the early days it was a
matter of survival itself. Indians were placed on reserva-
tions, not for their convenience but for the accommoda-
tion, convenience and safety of the white man. The
Alabama Coushatta reservation is the last Indian reserva-
tion remaining in Texas. Because the Act of 1854 forbids

them to sell the land, they have been in a very real
sense under a compulsion to remain with the land.  These
Indians, now numbering something over 400, formerly
roamed and claimed the vast domain from the Trinity to
the Sabine.  The State placed them on a reserve of two
square miles of thicket.

We agree with the Senate Committee that these
people, at least until the Legislature removes the re-
strictions that hold said reservation intact and prevent
its alienation, are wards of the state as well as the
nation.  Because of such relationsip the Legislature
has and had the power to appropriate funds for the benefit
of said reservation.  There is no constitutional provision
specifically authorizing such, but neither is there one
authorizing a State Orphans Home or many other eleemosynary
institutions which regularly receive substantial appropriat-
ions.  The validity of appropriations to such eleemosynary
institutions would never be seriously challenged.  They
are but reflections of the fundamental concepts of an en-
lightened citizenry who insist that this State shall look
after its own.  It is a recognized concept of all civilized
nations to endeavor to foster the welfare of the aborigine
whose lands they took, and to whom they thereby owe a
species of debt.  Our supreme court has said that "The
universal rule of construction is that legislative and
executive interpretations of the organic law, acquiesced
in and long continued . . . are of great weight in deter-
ining the validity of any act . . ." Mumme v. Marrs, 120
Tex. 383, 40 S.W. 2d 31 (1931).  Such interpretations by
the legislature and executive throughout the entire hist-
ory of Texas uphold the legality of these appropriations.
It follows, therefore, that we are of the opinion that
same are not in violation of Art. 3, Sec. 51 or of Art.
16, Sec. 6, of the Texas Constitution, which in substance
forbid appropriations for private purposes.

Under the Indian Reorganization Act of 1934, 48
Stat. 984, 25 USCA Sec. 476, one or more Indian tribes re-
siding on the same reservation were authorized to adopt
a constitution and bylaws to be approved by the Secretary
of the Interior.  On August 19, 1938 the Secretary ap-
proved such an instrument theretofore adopted by the
"Alabama and Coushatta Tribes of Texas."  You have fur-
nished us a copy of this document.  In many instances
it requires approval by the Secretary of the Interior
of tribal actions.

Sec. 3 of Public Law 627 of 1954, supra (25 USCA, Sec. 723), which terminated Federal supervision over the tribe, stated that "all powers of the Secretary of the Interior . . . to take, review, or approve any action under the constitution and bylaws of the Alabama and Coushatta Tribes of Texas approved on August 19, 1938 . . . are terminated. Any powers conferred upon the tribe by its constitution and bylaws that are inconsistent with the provisions of this Act are terminated. Such termination shall not affect the power of the tribe to take any action under its constitution and bylaws that is consistent with Secs. 721-728 of this title without the participation of the Secretary . . . in such action".

Your second question asks what portion of such constitution and bylaws is consistent with Public Law 627. It is our opinion that all of said constitution and bylaws is in harmony with said law and is still in force except in those instances wherein approval of certain acts by the Secretary of the Interior is called for. By the specific terms of such Act such approval is no longer necessary and is no longer a condition to the validity of any authorized actions. We understand informally that the Indians interpreted the Act as destroying their constitution and bylaws. We do not so interpret the Act but consider such document in full force except as above noted.

Public Law 627 contained a proviso that "such tribe is authorized to convey to the State of Texas the lands purchased for and deeded to the Alabama Indians" under the 1854 Act.

Your third inquiry asks three questions with reference to this provision:

"Will you please explain to us the legal significance of the terms 'authorized to convey' as used in the above paragraph? If such conveyance was not made, as authorized, is the State of Texas the rightful trustee of the 1280 acres of land deeded originally to the Alabama Indians? Can you determine that such conveyance was made?"

The Act of 1854 and the original deeds placed title to said land in the tribe of the Alabama Indians. By terms of the Act the land could not be sold.  Public Law 627 authorized a conveyance to the State to be executed by the Alabama and Coushatta tribes.  The said Act treats the two tribes as one tribe.  In any event, the language of the Act is not compulsory but leaves the matter up to the discretion of the tribe.  It is our understand that such a conveyance was not in fact made. Such being the case, the State is not a trustee of the land, since it belongs to the Indians.

Your fourth question inquires as to what right the State has to erect its office building, hospital and living quarters for white employees on the 1280 acres. While, as we have stated above, the State had the right to make such expenditures, the placing of such improvements on the lands not owned by the State could be properly done only with the consent of the Indian owners of the land, express or implied.  We think it a fair assumption that since these buildings were erected to benefit the Indians, and were, so far as we know, erected without objection, at least an implied consent was given.

You state that recently the Rural Electification Administration cut some timber on the 1280 acres in order to run a power line through the reservation, and your fifth question inquires as to what should be done with proceeds of the sale.

In the case of Downey v. Dowell, (Tex. Civ. App. 1918, error dism. f.w.j.), 207 S.W. 585, the Court said: "While it is true that standing timber is generally regarded as part of the realty, yet the owner may by contract constructively cause a severance, and for the purpose of a mortgage or sale convert it into personalty." citing authorities.

Upon the timber being cut, it became personalty and could be sold by the tribe, with the proceeds to be used by the Indians for tribal purposes.  The land is owned by the Indians and the State would own no interest in the receipts from sales of cut timber.  Under the circumstances, such sale would not violate the statutory restraint against alienating the land.

Ownership of the receipts aforesaid follows ownership of the land. In this connection we note that the original conveyances in 1854 and 1855 were to the tribe of the Alabama Indians. The Constitution and by-laws of 1938, adopted under the Indian Reorganization Act (48 Stat. 984), appear to have combined the Alabamas and Coushattas into one tribe under the name of "Alabama and Coushatta Tribes of Texas", and they are so treated by Congress in Public Law 627 aforesaid.

## SUMMARY

Current and past legislative appropriations for the benefit of the Alabama Coushatta Indian Reservation are legal and are not in violation of Art. 3, Sec. 51, and Art. 16, Sec. 6, of the Constitution of Texas. The 1938 Constitution and Bylaws adopted by the "Alabama and Coushatta Tribes of Texas" are still in force, except that approval by the Secretary of the Interior of tribal actions is no longer a prerequisite to the validity of such actions. Public Law 627, 83rd Congress, authorizing the Indians to convey a 1280 acre portion to the State of Texas is permissive and not compulsory. No such conveyance has been made. This 1280 acre tract still belongs to the Indians, and the State is not a trustee of such land. Since the said land belongs to the Indians, improvements may be placed thereon by the State only with the consent of said owners. Proceeds of the sale of timber cut for a power line are the property of the Indians, to be used for tribal purposes

APPROVED:

OPINION COMMITTEE

H. Grady Chandler,
   Chairman

Yours very truly

WILL WILSON
Attorney General

J. Arthur Sandlin

J. Arthur Sandlin
   Assistant